SUE FAHAMI
Acting United States Attorney
Nevada Bar Number 5634
MISTY L. DANTE
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Misty.Dante@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>519803.53164 USDT and 1135.508 XMR that are associated with transaction hashes 0x1ac48e72bb2fd83ad60a0f3f0cea5036e3bdcfe593a4a9be53c12c44a6197421, 0xbc0e435002aba822c6355e4f7571fe9b0d822e17e448c7262b2c9114ec325228, and 0x3e989f0de45e39c89e86032acc59e33c5161d492dde3c7b09ea19408ba74c931 sent to Gate.io USDT address 0x6BC5C2661D75f0Ced80754D3C7bD651f1d60f736 and held in the name of Avalanche Bridge,<br><br>　　　　　Defendant. | 2:25-CV-<br><br>**Complaint for Forfeiture in Rem** |

　　The United States of America in a civil cause for forfeiture, respectfully states as follows:

**SUBJECT MATTER JURISDICTION**

　　1.　This Court has jurisdiction under 19 U.S.C. §§ 1603, 1608, and 1610; Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Fed. R. Civ. P. Supp. Rule) C, E, and G; 18 U.S.C. § 981(a)(1)(A); 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 983; 18 U.S.C. § 984; and 28 U.S.C. §§ 1345, 1355, and 1395 because (1) the United States of America commenced this civil in rem action; (2) any of the acts or omissions giving rise to this forfeiture occurred in this judicial district; (3) the forfeiture

proceeding accrues in this judicial district; and (4) the above-named property is currently in this judicial district.

### IN REM JURISDICTION

2. This Court will have in rem jurisdiction over the defendant if this Court signs an Order for Summons and Warrant of Arrest in Rem for the Property and the Clerk of the Court issues a Summons and Warrant of Arrest in Rem for the Property, which will be executed upon the defendant and returned to the Court.

### VENUE

3. This Court is the proper venue of this matter under 28 U.S.C. § 1395, Fed. R. Civ. P. Supp. Rule C(2)(c) and G(1) because (1) the forfeiture proceeding accrues in this judicial district and (2) the above-named property (a) is currently in this judicial district and (b) was brought into this judicial district.

### PARTICULAR DESCRIPTION

4. The defendant is more particularly described as follows: 519803.53164 USDT (519803 USDT)[1] and 1135.508 XMR (1135 XMR)[2] that are associated with transaction hashes 0x1ac48e72bb2fd83ad60a0f3f0cea5036e3bdcfe593a4a9be53c12c44a6197421, 0xbc0e435002aba822c6355e4f7571fe9b0d822e17e448c7262b2c9114ec325228, and 0x3e989f0de45e39c89e86032acc59e33c5161d492dde3c7b09ea19408ba74c931 sent to Gate.io[3] USDT address 0x6BC5C2661D75f0Ced80754D3C7bD651f1d60f736 (property).

### PLACE OF SEIZURE

5. On March 20, 2024, the Federal Bureau of Investigation seized the 519803 USDT and 1135 XMR from gate.io through the transfer of the defendant property to an FBI cryptocurrency wallet.

---

[1] A type of digital coin named Tether. The value of this coin is backed by the value of the United States Dollar.
[2] XMR refers to cryptocurrency named Monero, a privacy-oriented cryptocurrency.
[3] Gate.io is a crypto exchange which provides a user of the platform the ability to buy, sell, or swap digital currencies.

## CUSTODY OF ASSET

6. The defendant property is currently in the care, custody, and control of the FBI and is currently being stored in the FBI vault located in Las Vegas, Nevada.

## TIMELY FILING

7. This Complaint is timely filed.

## VALUE

8. At the time of the seizure, the value of the defendant property was $519,803.53 for the USDT and $158,000 for the XMR. The value of the defendant property will increase or decrease based on the current value of the cryptocurrency in the global marketplace.

## FORFEITURE STATUTES

9. Because of the information below, the defendant property is subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C).

## FACTS

10. On August 18, 2023, a company (Victim A) located in Las Vegas, Nevada, was the victim of a cyber-attack.

11. The unknown subjects gained unauthorized access into Victim A's network and stole sensitive company data.

12. The unknown subjects demanded Victim A to pay the unknown subjects in bitcoin (BTC)[4] and threatened that the data would be publicly released if Victim A did not comply.

13. The unknown subjects initially demanded $30 million USD worth of BTC be paid by Victim A or the sensitive data would be publicly released.

14. Victim A negotiated the extortion payment down to approximately $15 million USD. The unknown subjects promised to delete the stolen data after they received the payment.

---

[4] A glossary of cryptocurrency-related terms is provided in Exhibit 1 to the Complaint.

3

15.     Victim A paid the extortion payment in two separate purchases of BTC. Through subsequent analysis (using a commercially available crypto-tracing tool), law enforcement traced the BTC transactions sent from Victim A to a point known in crypto currency transactions as a bridge, in this case extortion payment wallets Avalanche Bridge. The property was traced based on the "Illegal Proceeds In, First Out" (or last-in, first-out) accounting principle, which assumes that the last or most recent incoming assets are the first expended or sent out. *See United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir. 1986) (government can establish prima facie case for forfeiture by relying on the "last-in, last-out" approach or the "last-in, first-out" approach.) [5]

16.     A detailed summary flowchart attached as Exhibit 2 describes the transfer of the illegal proceeds from the extorted payments made by Victim A to the unknown subjects.

17.     When the illegal proceeds were transferred from the extorted payments made by Victim A to the unknown subjects, BTC fees, in the form of a minute portion of the BTC, may have been paid in small amounts as each transaction progressed.[6]

18.     Victim A paid the unknown subjects through two separate transactions. On September 11, 2023, Victim A sent the first payment in the amount of approximately 297 BTC to BTC address bc1qmrcc0dtdn3c785phrncf5wtz98q9qy8ndpd5ev (Extortion Wallet 1).

/ / /

---

[5] Also known as the "'drugs-in, first-out' rule. As the name suggests, this rule posits that when withdrawals are made, tainted money leaves the account first." *United Sates v. Dillion*, No. 1:16-cr-00037-BLW, 2022 WL 2105974, *4 (D. Ida. Jun. 10, 2022) (citing *Banco*, 797 F.2d at 1158

[6] Bitcoin (BTC) fees are the costs that users pay to have their transactions processed by miners on the Bitcoin network. These fees incentivize miners to include transactions in the blocks they create. The amount of the fee can vary based on several factors, including network congestion and the transaction size. Network congestion occurs when the Bitcoin network is congested (i.e., there are more transactions waiting to be processed than available space in the blocks), fees increase because users compete to have their transactions confirmed quickly. Transaction size fees are calculated based on the size of the transaction in bytes, rather than the amount of Bitcoin being transferred. Larger transactions (in terms of data size) will require higher fees. *See also* https://youtu.be/waP7n8crMhg?si=SAPuglPJD5AqE3HU.

19. On October 11, 2023, Victim A paid the second payment in the amount of approximately 277 BTC. As instructed to do so by the unknown subjects, Victim A sent the second payment to BTC address bc1q5ft3et8h0qp4ppk6hjjhfxmmy32egzgvrgtwsn (Extortion Wallet 2).

20. Prior to these transfers, Extortion Wallet 1 and Extortion Wallet 2 did not have a balance, nor did either wallet receive any additional payments. Therefore, there was no co-mingling of any previous cryptocurrencies. Upon information and belief, Extortion Wallet 1 and Extortion Wallet 2 appeared to have been opened only for the purpose of receiving these two payments.

21. On September 12, 2023, the unknown subjects who had access/ownership of Extortion Wallet 1 sent approximately 125 BTC (of the initially deposited 297 BTC) from Extortion Wallet 1 to bc1qy43glppnqfrey5yt97xv7fyrcn0a04npfwtef5 (Transfer Wallet 1). Prior to this transfer, Transfer Wallet 1 did not have a balance, nor did it receive any additional payments. Therefore, there was no co-mingling of any previous cryptocurrencies. Upon information and belief, Transfer Wallet 1 appeared to have been opened only for the purpose of receiving the transfer of Victim A's first payment.

22. On January 19, 2024, the unknown subjects who had access/ownership of Extortion Wallet 2 and Transfer Wallet 1 combined the BTC in Extortion Wallet 2 and Transfer Wallet 1 into the BTC address bc1qpy24cr5lukg33cpt3mx9xx3368mu4x2znnswt4 (Combined Wallet 1): approximately 125 BTC was sent from Transfer Wallet 1 and approximately 277 BTC was sent from Extortion Wallet 2. Prior to this transfer, Combined Wallet 1 did not have a balance, nor did it receive any additional payments. Therefore, there was no co-mingling of any previous cryptocurrencies. Upon information and belief, Combined Wallet 1 appeared to have been opened only for the purpose of receiving the transfer of Victim A's first and second payments.

23. The unknown subjects who had access/ownership of Combined Wallet 1 then transferred all the cryptocurrencies in Combined Wallet 1 to the Avalanche Bridge

///

5

BTC address bc1q2f0tczgrukdxjrhhadpft2fehzpcrwrz549u90 (Avalanche Wallet 1) via two separate transactions by the unknown subjects.

24. On January 19, 2024, at 07:57 (UTC), Avalanche Wallet 1 received approximately 125 BTC from Combined Wallet 1.

25. On the same day, at 22:36 (UTC), Avalanche Wallet 1 received approximately 277 BTC from Combined Wallet 1.

26. As a result of these transactions, Avalanche Wallet 1 received a total amount of approximately 402 BTC.

27. On January 19, 2024, the FBI contacted Ava Labs, Inc., and requested it to voluntarily freeze the 402.41203181 BTC sent to Avalanche Wallet 1.

28. Ava Labs, Inc., agreed to voluntarily freeze the 277.56327614 BTC transferred from Extortion Wallet 2 to Avalanche Wallet 1 (which went to Combined Wallet 1 before Avalanche Wallet 1), until service of a civil forfeiture seizure warrant. However, Ava Labs, Inc., was not able to voluntarily freeze the 125 BTC transferred from Extortion Wallet 1 to Avalanche Wallet 1 (which went to Combined Wallet 1 before Avalanche Wallet 1) because the 125 BTC had already been transferred from Avalanche Wallet 1.

29. On January 19, 2024, an unknown actor transferred the 125 BTC from Extortion Wallet 1 that was now in Avalanche Wallet 1 through the Avalanche Bridge to the wallet 0x97937B9CF687379322E54A8DA35d5D2b243857E6 (BTCB Wallet). The approximate 125 BTC was valued at $5,152,669.48 USD. Prior to this transfer, the BTCB Wallet did not have a balance.[7] A more detailed overview is found in Exhibit 3.

30. Between January 20, 2024, and January 21, 2024, cryptocurrency totaling in the amount of $3,185,995.35 USD was sent to wallet 0x1934d0D0CbF872Ff11cDb859deD6Dd6c5C7cbC1e (AVAX Wallet 1) from the BTCB Wallet. Prior to this transfer, AVAX Wallet 1 did not have a balance.

/ / /

---

[7] Exhibit 3 is attached hereto and incorporated herein by reference as if fully set forth herein.

6

31. On January 21, 2024, cryptocurrency totaling in the amount of $2,198,220.27 USD was sent to wallet 0xA3631164d97ec60407DFe79b91b19C8eF83ADABe (AVAX Wallet 2) from AVAX Wallet 1. Prior to this transfer, AVAX Wallet 2 did not have a balance.

32. On January 22, 2024, at 23:06 UTC, cryptocurrency totaling in the amount of $699,045.50 USD was sent to wallet 0x4C526de3f37Da24d2F21155222374633036fc619 (AVAX Wallet 3) from AVAX Wallet 2. AVAX Wallet 3 had a previous balance of $131.67 USD prior to this transaction.

33. On January 22, 2024, at 23:47 UTC, cryptocurrency totaling in the amount of $699,059.36 USD was sent to wallet 0xe7eCA93471d1105947038f6A927C1E03c43D67E9 (AVAX Wallet 4) from AVAX Wallet 3. AVAX Wallet 4 had a previous balance of $10.10 USD prior to the transaction.

34. AVAX Wallet 3 had a remaining balance of $138.78 USD. There were no other transactions after the transfer from AVAX Wallet 2 to AVAX Wallet 3 or before the transfer from AVAX Wallet 3 to AVAX Wallet 4.

35. Between January 22, 2024, and January 23, 2024, cryptocurrency totaling in the amount of $690,755.00 USD was sent to wallet 0x198a65D7AC0e785Ab99A2c671b41a534dBa72f44 (Stargate Wallet 1) from AVAX Wallet 4. Prior to this transfer, Stargate Wallet 1 did not have a balance.

36. AVAX Wallet 4 had a remaining balance of $5,862.897 USD. There were no other transactions after the transfer from AVAX Wallet 3 to AVAX Wallet 4 or before the transfer from AVAX Wallet 4 to Stargate Wallet 1.

37. On January 23, 2024, cryptocurrency totaling in the amount of $690,901.68 (519845.30160479 USDT and 1135.51517101 XMR) was sent to Gate.io wallet 0x6BC5C2661D75f0Ced80754D3C7bD651f1d60f736 (Gate.io Wallet) from Stargate Wallet 1. These cryptocurrencies were sent in three separate transactions: 0x1ac48e72bb2fd83ad60a0f3f0cea5036e3bdcfe593a4a9be53c12c44a6197421,

///

0xbc0e435002aba822c6355e4f7571fe9b0d822e17e448c7262b2c9114ec325228, and 0x3e989f0de45e39c89e86032acc59e33c5161d492dde3c7b09ea19408ba74c931.

38. Stargate Wallet 1 had a remaining balance of .021445 USDT and 10.0415 MATIC.

39. On January 24, 2024, the FBI contacted Gate.io and requested it to voluntarily freeze the 519845.30160479 USDT and 1135.51517101 XMR sent to the Gate.io Wallet. On February 4, 2024, Gate.io confirmed the cryptocurrency were voluntarily frozen in the Gate.io Wallet 1. The Gate.io Wallet 1 contains 519803.53164 USDT and 1135.508 XMR. Based on the amount of funds in the wallet, and the fact that Gate.io froze these funds, it is unlikely that there was a balance in Gate.io Wallet 1 prior to this transaction.

**FIRST CAUSE OF ACTION**

40. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

41. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(2)(C), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

**SECOND CAUSE OF ACTION**

42. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

43. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(2)(C), a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(D), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

**THIRD CAUSE OF ACTION**

44. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

/ / /

45. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(5)(A), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## FOURTH CAUSE OF ACTION

46. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

47. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(5)(A), a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(D), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## FIFTH CAUSE OF ACTION

48. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

49. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(7), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## SIXTH CAUSE OF ACTION

50. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

51. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1030(a)(7), a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(D), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## SEVENTH CAUSE OF ACTION

52. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

/ / /

/ / /

53. The defendant is any property, real or personal, involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or any property traceable to such property, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

**EIGHTH CAUSE OF ACTION**

54. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

55. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1956(a)(1)(B)(i), a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

**NINTH CAUSE OF ACTION**

56. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

57. The defendant is any property, real or personal, involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or any property traceable to such property, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

**TENTH CAUSE OF ACTION**

58. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 39 as though fully set forth herein.

59. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1957, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

**CONCLUSION**

60. Because of the foregoing, the defendant is subject to forfeiture and has become and is forfeited to the United States of America, plaintiff, under 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C).

/ / /

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America, Plaintiff, prays as follows:

1. Due process issue to enforce the forfeiture of the defendant;

2. Due notice be given to any interested party to appear and to show cause why the forfeiture should not be decreed;

3. The defendant be condemned and be forfeited to the United States; and

4. This Court enter other and further relief as it deems just and proper.

Dated: March 21, 2025.

                                                Respectfully submitted,

                                                SUE FAHAMI
                                                Acting United States Attorney

                                                */s/  Misty L. Dante*
                                                MISTY L. DANTE
                                                Assistant United States Attorney

## VERIFICATION

I, Andrew Buel, am a Special Agent with the Federal Bureau of Investigation. I have read the contents of the foregoing Complaint, and under 28 U.S.C. § 1746(2), I declare and verify under penalty of perjury that the foregoing is true and correct.

Executed this March 21, 2025.

ANDREW BUEL
Special Agent
Federal Bureau of Investigation

**EXHIBIT 1**

**Glossary of Cryptocurrency-Related Terms**

1. Bitcoin[8] (or BTC) is a type of cryptocurrency. Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by mining. An individual can mine bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as pseudonymous, meaning that they are partially anonymous. And while it's not completely anonymous, Bitcoin allows users to transfer bitcoin more anonymously than would be possible through traditional banking and financial systems.

/ / /

---

[8] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice is to use Bitcoin (singular with an uppercase letter B) to label the protocol, software, and community, and bitcoin (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

2. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a blockchain, which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[9] Cryptocurrency is not illegal in the United States.

3. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is a unique number associated with cryptocurrency that is used to display it, and a private key is akin to a password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public key (or public address) and the private key (or private address). A public key is represented as a case-sensitive string of letters and numbers, 25–26 characters long. Each public key is controlled and/or accessed using a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of a public key's private key can authorize any transfers of cryptocurrency from that public key to another cryptocurrency key.

---

[9] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

4.      Although cryptocurrencies such as bitcoin have legitimate uses, individuals and organizations use cryptocurrency for criminal purposes such as money laundering and is an often used means of payment for illegal goods and services on hidden service websites operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces. As of January 31, 2024, one bitcoin is worth approximately $42,664.21 USD. The value of bitcoin is generally much more volatile than that of fiat currencies.

5.      Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device (hardware wallet), downloaded on a PC or laptop (desktop wallet), with an Internet-based cloud storage provider (online wallet), as a mobile application on a smartphone or tablet (mobile wallet), printed public and private keys (paper wallet), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g., Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[10] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a recovery seed (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). Individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become

---

[10] A QR code is a matrix barcode that is a machine-readable optical label.

further secured in the event their assets become potentially vulnerable to seizure and/or unauthorized transfer.

6. Bitcoin exchangers and exchanges are individuals or companies that exchange bitcoin for other currencies, including United States currency. According to Department of Treasury, Financial Crimes Enforcement Network (FinCEN) Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[11] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). Registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering (AML) regulations, Know Your Customer (KYC) protocols, and other verification procedures like those employed by traditional financial institutions. For example, to open and maintain accounts on their exchange, FinCEN-registered cryptocurrency exchangers often require customers to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10%; in contrast to registered and Bank Secrecy Act compliant exchangers, who charge fees as low as 1–2%.

7. Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN or password.

---

[11] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

16

Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' cryptocurrencies or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone or other digital device, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

8. The terms communications, records, documents, programs, or materials include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, pictures or videos), or electrical, electronic, or magnetic form, as well as digital data files. These terms also include any applications, i.e., software programs. These terms expressly include, among other things, emails, instant messages, chat logs, correspondence attached to emails (or drafts), calendar entries, buddy lists. etc.

9. Internet Protocol address, or IP address, refers to a numeric address used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique number to a user's device at set intervals (called lease periods) when the device accesses the Internet. IP addresses might also be static, that is, an ISP assigns a user's device a particular IP address, which is used each time the computer accesses the Internet.

10. In general terms, a server is a physical computer that processes data for one or more users over a local network or the Internet. An example is a physical computer

17

operated by a popular email service like Google or Yahoo, which stores and receives emails for many users who access the server through the Internet. In some cases, a host/operator of a physical server allows others to remotely (e.g., via the Internet) rent or lease part of the server to use as their own, smaller server. These smaller, leasable servers are often called virtual private servers (VPS) because virtual-machine technology is what allows the server operator to run multiple private servers on the same physical server.

# **EXHIBIT 2**

Overview of Payment and Transfer of 402.41203181 BTC

| Date | Source | Destination | Amount |
|---|---|---|---|
| 9/11/2023 | Victim A | bc1qmrcc0dtdn3c785phrncf5wtz98q9qy8ndpd5ev | 297.6792 |
| 9/12/2023 | bc1qmrcc0dtdn3c785phrncf5wtz98q9qy8ndpd5ev | bc1qy43glppnqfrey5yt97xv7fyrcn0a04npfwtef5 | 124.849 |
| 10/12/2023 | Victim A | bc1q5ft3et8h0qp4ppk6hjjhfxmmy32egzgvrgtwsn | 277.5636 |
| 1/19/2024 | bc1qy43glppnqfrey5yt97xv7fyrcn0a04npfwtef5 | bc1qpy24cr5lukg33cpt3mx9xx3368mu4x2znnswt4 | 124.849 |
| 1/19/2024 | bc1q5ft3et8h0qp4ppk6hjjhfxmmy32egzgvrgtwsn | bc1qpy24cr5lukg33cpt3mx9xx3368mu4x2znnswt4 | 277.5634 |
| 1/19/2024 | bc1qpy24cr5lukg33cpt3mx9xx3368mu4x2znnswt4 | bc1q2f0tczgrukdxjrhhadpft2fehzpcrwrz549u90 | 124.8488 |
| 1/19/2024 | bc1qpy24cr5lukg33cpt3mx9xx3368mu4x2znnswt4 | bc1q2f0tczgrukdxjrhhadpft2fehzpcrwrz549u90 | 277.5633 |



**EXHIBIT 3**

| Date | Source | Destination | Amount |
|---|---|---|---|
| 1/19/2024 | Avalanche Bridge | BTCB Wallet 1 | $5,152,669.48 |
| 1/20-21/2024 | BTCB Wallet 1 | AVAX Wallet 1 | $3,185,995.35 |
| 1/22/2024 | AVAX Wallet 1 | AVAX Wallet 2 | $2,198,220.27 |
| 1/22/2024 | AVAX Wallet 2 | AVAX Wallet 3 | $699,045.50 |
| 1/22/2024 | AVAX Wallet 3 | AVAX Wallet 4 | $699,059.36 |
| 1/22/2024 | AVAX Wallet 4 | Stargate Wallet 1 | $690,755.00 |
| 1/23/2024 | Stargate Wallet 1 | Gate.io Wallet | $690,901.68 (519845.30160479 USDT and 1135.51517101 XMR) |



20